UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PNC BANK, NATIONAL ASSOCIATION,

          Plaintiff,

    v.                                   Case No. 18 C 4167

SAMUEL G. BOYTOR and CAROL A.
BOYTOR,                                Magistrate Judge Sunil R. Harjani

          Defendants.

## MEMORANDUM OPINION AND ORDER

In this action, Plaintiff PNC Bank, National Association sues Defendants Samuel G. Boytor and Carol A. Boytor for defaulting on two loans the Boytors entered into with a predecessor bank in April 2006. Specifically, PNC has moved to foreclose a mortgage securing the payment of a $203,000 note (Count I), and for the entry of a money judgment relating to the nonpayment of a $200,000 note (Count II). The Court presided over a two-day virtual bench trial beginning on May 25, 2021.[1] Docs. [133-35]. A couple of weeks before trial, the Boytors filed a motion for leave to file an amended answer and affirmative defenses, Doc. [129]. For the following reasons, the Court grants the Boytors' motion, Doc. [129], and finds in favor of PNC on both counts.

## I.    BOYTORS' MOTION FOR LEAVE TO FILE AMENDED ANSWER

Before turning to the Court's findings of fact and conclusions of law, the Court initially addresses the Boytors' Motion for Leave to File Amended Answer and Affirmative Defenses, Doc. [129].

---

[1] The parties consented to this Court's jurisdiction on February 12, 2019, Doc. [41], as well as a bench trial via videoconferencing. Doc. [116].

Rule 15 of the Federal Rules of Civil Procedure states that leave to amend a pleading should be freely given when justice so requires. Fed. R. Civ. P. 15(a)(2). The liberal allowance of pleadings reflects the preference that controversies be decided on the merits when practicable. *Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 520 (7th Cir. 2015). At the same time, the decision to grant or deny a motion to amend a pleading is within the sole discretion of the trial court. *Daugherity v. Traylor Bros., Inc.*, 970 F.2d 348, 351 (7th Cir.1992). As such, the trial court may refuse to grant leave "if the moving party has unduly delayed in filing the motion, if the opposing party would suffer undue prejudice, or if the pleading is futile." *Campania Mgmt. Co. v. Rooks, Pitts & Poust*, 290 F.3d 843, 849 (7th Cir. 2002) (citations omitted).

PNC opposes the Boytors' Rule 15 motion, arguing first that the Boytors unduly delayed in seeking leave to amend their answer. Doc. [139] at 4-5. In *Campania*, the Seventh Circuit affirmed the trial court's denial of a Rule 15 motion, which was filed a mere six days before the close of discovery. 290 F.3d at 846. Here, the delay is even more pronounced, as the Boytors' motion was filed two years after the close of discovery and only two weeks before the trial began. Docs. [45, 129, 134]. However, the Boytors obtained new counsel, with leave of the Court, on April 29, 2021. Doc. [128]. The new lawyer quickly apprised himself of the case and requested leave to amend the answer, less than a couple of weeks after filing his appearance. Doc. [129]. Boytors' new counsel also immediately produced any new documents that he obtained from the Kane County Recorder's office relating to the loans in question. While the Court agrees with PNC that the appointment of new counsel does not, in and of itself, excuse a two-plus year delay in requesting to amend the pleadings, *see* Doc. [139] at 5, it does constitute a reason for the Boytors' delay. In addition, the Court prefers to resolve the case on the merits, rather than on procedural

2

shortcomings. *See Runnion*, 786 F. 3d at 520. The Court therefore will not deny the Rule 15 motion based on the Boytors' admittedly lengthy delay in filing the motion in this case.

PNC's second contention is that it will suffer undue prejudice if the Court allows the Boytors to amend their answer now. Doc. [139] at 5. Amendments to pleadings "may be prejudicial when they force parties to re-litigate issues that have already been settled or to incur additional discovery costs, or if they would render a party's litigation preparation wasted." *Hoenig v. Karl Knauz Motors, Inc.*, 983 F. Supp. 2d 952, 960 (N.D. Ill. 2013) (citations omitted). PNC alleges here that it would be "severely prejudiced" by the Boytors' amended answer because PNC "was deprived of proper notice as to the contents of the proposed Amended Answer and affirmative defenses and thus was unable to properly pursue further discovery related to the release of mortgage and alleged payment to PNC." Doc. [139] at 5. At the outset, the Boytors' motion alerted PNC to its amended answer and affirmative defenses prior to trial, and thus PNC had a sufficient opportunity to prepare its response. The documents supporting the Boytors' new defenses, moreover, largely comprise of documents already in discovery, or documents from the Kane County Recorder's office (publicly available), which were immediately produced to PNC upon the appointment of the Boytors' new counsel. As a result, it is not clear what "further discovery related to the release of mortgage and alleged payment to PNC," would be needed, Doc. [139] at 5, and PNC has not elaborated. And, as discussed further below, PNC already holds the burden to show that the Boytors failed to pay off their loans, so a payment defense is simply the opposite position and thus should not expand the scope of discovery in the case. All in all, PNC has not demonstrated that the amended answer and affirmative defenses would require the parties to re-litigate issues, incur additional discovery costs, or render PNC's litigation preparation

wasted, *see Hoenig*, 983 F. Supp. 2d at 960, so the Court does not find that PNC would be unduly prejudiced by the granting of the Rule 15 motion.

Third and finally, PNC asserts that the Boytors' proposed amendment is futile to their case. "A court may determine that a proposed amendment is futile if it sets forth facts or legal theories that are redundant, immaterial, or unresponsive to the allegations in the complaint." *Campania*, 290 F.3d at 850 (citation omitted). *See, e.g.*, *Wade v. WellPoint, Inc.* 892 F. Supp. 2d 1102 (S.D. Ind. 2012) (denying plaintiff's motion for leave to file amended complaint on futility grounds where proposed amended complaint appending allegations of additional fraud scheme failed to establish strong inference of scienter mandated in securities fraud cases). PNC argues that allowing the Boytors to file an amended answer with new affirmative answers would be futile because the affirmative defenses are not adequately pled in accordance with Rules 8 and 9 of the Federal Rules of Civil Procedure. Doc. [139] at 5-6. PNC further argues that the proposed amendment is futile because it is redundant in "mirror[ing] the themes of the answers set forth in the Boytors' original answers: payment, bank error, condition precedent." Doc. [139] at 5.[2]

PNC's futility arguments do not persuade the Court that the Rule 15 motion should be denied. As an initial matter, arguing that it would be pointless to allow the Boytors to amend their answer because they have already alleged payment, bank error, and condition precedent defenses undermines PNC's argument that it would be severely prejudiced by allowing the amended answer. For, if the amended answer so resembles the original answer, it is unlikely that the

---

[2] PNC additionally contends that the proposed amended answer is nonresponsive to the complaint. Yet, aside from citing one paragraph from the Boytors' proposed amended answer, PNC does not explain how the cited language, or the proposed amended answer in general, is nonresponsive. PNC's unsupported argument is thus waived. *See United States v. Cisneros*, 846 F.3d 972, 978 (7th Cir. 2017) (citations omitted) ("We have repeatedly and consistently held that 'perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.'").

amended answer should lead to additional discovery costs or wasted litigation preparation by PNC. In terms of the sufficiency of the Boytors' pleading of affirmative defenses, the Court does share some of PNC's concerns.  For instance, the proposed estoppel defense states only that "[t]he plaintiff is estopped from pursuing any claims based upon the releases they recorded which stated the obligation was paid." Doc. [129] at 9.  This barebones assertion omits not only basic information regarding the dates and documents, but also fails to identify which type of estoppel is being pled, as well as the elements for an estoppel claim.  Such a defense would be unlikely to survive a motion to strike. *See Edwards v. Mack Trucks, Inc.*, 310 F.R.D. 382, 386 (N.D. Ill. 2015) (collecting cases) (one-sentence affirmative defenses that are threadbare recitals of the elements, conclusory statements, or mere denials of the complaint are insufficient to survive a motion to strike).  That said, the Court still prefers to decide this case on the merits, and the Court heard evidence—from both sides—regarding the Boytors' new affirmative defenses at trial, including the estoppel defense, despite their scant pleading language. (*See, e.g.*, 5/25/21 Trial Tr. 97:1-99:14[3] (PNC soliciting testimony on direct examination from bank employee on the Boytors' release defense)).  Despite this reality, PNC fails to address the Boytors' request that the Court allow them to amend their pleadings to conform to the evidence presented at trial.  Put another way, even if the Court were inclined to deny the Boytors' motion for leave to file an amended answer under Rule 15(a) due to their delay in filing the motion or the limited nature of their affirmative defenses, the Boytors have additionally requested that their answer be amended to reflect the evidence in the record regarding the Boytors' affirmative defenses. Doc. [129] at 2.

Under Rule 15(b) of the Federal Rules of Civil Procedure, the Court may grant leave to amend the pleadings to conform to the evidence presented at trial.  Rule 15(b) creates a system in

---

[3] For purposes of citing the trial transcripts, this opinion cites to the date of the trial testimony and the ECF page number at the top of the page.

which "the complaint does not fix the plaintiff's rights but may be amended at any time to conform to the evidence." *Winger v. Winger*, 82 F.3d 140, 144 (7th Cir. 1998) (citing *Duckworth v. Franzen*, 78 F.2d 645, 649 (7th Cir.1985), *cert. denied*, 479 U.S. 816 (1986)). By the same token, courts have granted defendants leave under Rule 15(b) to amend their answers to conform to the evidence. *See Stepan v. City of Evanston*, No. 91 C 6713, 1993 WL 210534, at *5 n.3 (N.D. Ill. June 11, 1993) (conforming contradictory paragraph in answer to conform with evidence presented in defendant's summary judgment brief); *Empire Gas Co. v. Am. Bakeries Co.,* No. 82 C 815, 1987 WL 6867, at *7 (N.D. Ill. Feb. 19, 1987), *aff'd in part, modified in part sub nom. Empire Gas Corp. v. Am. Bakeries Co*., 840 F.2d 1333 (7th Cir. 1988) (citations omitted) (granting defendant's motion for leave to amend answer to include additional good faith defense where evidence was presented on the topic at trial without objection). Again, the intention of the rule is "to provide the maximum opportunity for each claim to be decided on its merits rather than on procedural niceties." *Matter of Prescott*, 805 F.2d 719, 725 (7th Cir. 1986) (citation omitted).

In the Seventh Circuit, "[t]he key factor in determining whether the pleadings have been amended" under Rule 15(b), "is whether the issue has been tried with the express or implied consent of the parties." *Prescott*, 805 F.2d at 725. The general test for consent is "whether the opposing party had a fair opportunity to defend and whether he could have presented additional evidence had he known sooner the substance of the amendment." *Aldridge v. Forest River, Inc*., 635 F.3d 870, 875 (7th Cir. 2011) (quoting *In re Rivinius, Inc*., 977 F.2d 1171, 1175 (7th Cir. 1992)). The Court also considers: (1) whether the party opposing the Rule 15 motion objected to a contested ground as "not within the issues made by the pleadings"; and (2) whether "the opposing party itself present[ed] evidence on the matter." *Prescott*, 805 F.2d at 725 (internal quotation marks and citations omitted).

Here, the Court finds that PNC impliedly consented, as the term is used in *Prescott*, to trying the Boytors' affirmative defenses. The Court recognizes that PNC opposed amendment of the Boytors' answer prior to trial. However, PNC also knew of the Boytors' proposed amended answer and affirmative defenses before trial and had the opportunity to defend and present evidence on the topics at trial. PNC, furthermore, offered rebuttal evidence regarding the Boytors' proposed affirmative defenses and responded to those affirmative defenses in their post-trial brief. (*See, e.g.*, 5/25/21 Trial Tr. 97:1-99:14); Doc. [146] at 18-25. The Court can glean no prejudice to PNC from the trial that included a presentation on the affirmative defenses. The Court therefore finds that PNC consented to trying the new issues created by the Boytors' proposed answer and affirmative defenses, and that the Boytors' original answer and affirmative defenses have been constructively amended by the trial.

Bringing it all together, the Court has considered PNC's arguments regarding delay, prejudice, and futility. While PNC has highlighted some reasons that the Court *could* deny the Rule 15 motion, the Court declines to do so for three main reasons. First, the Court intends on weighing this case on the merits. Second, PNC has failed to show that it would be unduly prejudiced by the amendment. Third, the Court finds that PNC impliedly consented to trying the proposed affirmative defenses. The Court therefore grants the Boytors' motion for leave to file an amended answer and affirmative defenses instanter. As such, the Court will consider the amended answer attached to the Boytors' motion, *see* Doc. [129] at 4-10, to be the operative answer in the case.

Having granted the Boytors' motion for leave to amend, the Court turns next to issuing its findings of fact and conclusions of law resulting from the bench trial that took place on May 25, 2021 and May 26, 2021, pursuant to Rule 52 of the Federal Rules of Civil Procedure. The

Court has considered the testimony, admitted exhibits, and post-trial briefs submitted by the parties. *See* Docs. [141, 142, 143, 145, 146, 147, 148].

## II. FINDINGS OF FACT

### A. The Parties

#### 1. PNC

Plaintiff PNC is a national banking association and wholly owned subsidiary of PNC Bancorp, Inc. (PX1). PNC's organization certificate lists the State of Pennsylvania as the location of PNC's main office. Docs. [1, 115, 129].[4]

Through a series of mergers, PNC became the holder of the notes at issue in this case. (PX1; 5/25/21 Trial Tr. 73:17-74:11). Effective February 1, 2006, EFS Bank merged with Mid America Bank, FSB. (PX1). Effective February 9, 2008, Mid America Bank, FSB merged with National City Bank. *Id.* National City Bank became a wholly owned subsidiary of the PNC Financial Services Group, Inc. effective December 31, 2008. *Id.* National City Bank was merged with PNC Bank, National Association effective November 6, 2009. *Id.*

#### 2. Samuel Boytor and Carol Boytor

Defendant Samuel Boytor, husband of Defendant Carol Boytor, was born on October 28, 1955. (5/25/21 Trial Tr. 182:19-22). He obtained a bachelor's degree in biochemistry from Loyola University and a graduate degree in medical engineering from the Illinois Institute of Technology. *Id.* at 183:6-16. Mr. Boytor subsequently was an engineer for Hunter Automated Machinery and an engineering director for the automation group of Littell Machine Company in Chicago. *Id.* at 183:17-184:3. In 1988, Mr. Boytor started his own company, Fox Controls. *Id.* at 184:12-13. Mr.

---

[4] A March 14, 2011 PNC certificate in evidence lists Delaware as the location of PNC's main office. (PX1 ¶ 6). However, PNC pleaded, and the Boytors admitted in their answer, that PNC's main office is located in Pennsylvania. Docs. [1, 129]. Either way, diversity jurisdiction would exist, as the Boytors are citizens of Illinois.

Boytor later created Safe-T-Sense, initially as a division of Fox Controls. *Id.* at 184:24-185:5. Mr. Boytor later spun the Safe-T-Sense group off as its own separate entity. *Id.* at 185:1-12. Fox Controls and Safe-T-Sense were operated out of 11N026 Rippburger Road in Plano Center, Illinois. *Id.* at 185:13-19.

Defendant Carol Boytor was born on July 11, 1956. (5/26/21 Trial Tr. 48:20-23). After graduating from high school, she worked in several banks, including Chase and Citibank. *Id.* at 48:24-50:6. Mrs. Boytor currently is employed as a business analyst with ComEd. *Id.* at 49:10-15.

Both Sam and Carol Boytor were signatories to the notes, mortgages, and agreements central to the issues of this case. (*See, e.g.*, PX2; PX3; PX4; PX5; PX6; PX8; PX13; PX15).

## B.     Transaction History

### 1.     The Settlement Agreement

On March 10, 2006, Scott Reining (on behalf of Mid America Bank, FSB), Defendant Samuel Boytor (individually and as President of Safe-T-Sense, President of Fox Controls), and Defendant Carol Boytor (individually) entered into a settlement agreement. (PX2 at 5). Under the terms of the settlement agreement, the Boytors agreed to obtain $300,000 of financing from Minarik Corporation in order to reduce the borrower obligations of Fox Controls and Safe-T-Sense, obligations which were guaranteed by the Boytors. *Id.* at 1. At the time of the settlement agreement, Fox Controls and Safe-T-Sense had six outstanding loans with the bank and an unpaid balance "as much as $1,200,000 or more[.]" *Id.* at 1, 6. In exchange for receiving the $300,000 in special financing, the bank agreed to release the lender liens against Safe-T-Sense and Fox Controls assets. *Id.* ¶ 2. The parties further agreed to enter into a new note and first mortgage

financing in the amount of $600,000, a junior note in the amount of $200,000 to be secured by a junior mortgage, and a new note and first mortgage financing in the amount of $405,000. *Id.* at ¶ 3.

Around April 21, 2006, the parties entered into an amendment to the settlement agreement. (PX3). The amendment changed the settlement deadline to April 24, 2006 and deleted the paragraph pertaining to the $405,000 note and mortgage. *Id.* ¶¶ 1-2. In its place, the amendment called for the parties to enter into a new note, secure by a second mortgage on the Boytors' residential property in the amount of $203,000. *Id.* ¶ 2.

### 2. The $200,000 Promissory Note and Mortgage

On April 20, 2006, the Boytors signed a promissory note with MidAmerica Bank, fsb in the amount of $200,000. (PX4). The loan was numbered 200601098 and had a maturity date of April 3, 2009. *Id.* The loan did not accumulate interest before the maturity date, but upon default, the bank could increase the interest rate to 7.5%, if allowed under applicable law. *Id.*

On April 20, 2006, the Boytors granted a mortgage to MidAmerica Bank, fsb, on their commercial property at 11N026 Rippburger Road in Plato Center, Illinois. (DX5 at 1, 2, 13). The purpose of the mortgage was to secure the payment of the $200,000 note dated April 20, 2006. *Id.* at 12. The mortgage was recorded by the Kane County Recorder's office on May 8, 2006 and was assigned number 2006K048628. *Id.* at 1.

### 3. The $203,000 Promissory Note and Mortgage

On April 24, 2006, the Boytors signed a promissory note with MidAmerica Bank, fsb in the amount of $203,000. (PX5). The loan was numbered 200601395 and had a maturity date of April 3, 2009. *Id.* The loan did not accumulate interest before the maturity date, but upon default, the bank could increase the interest rate to 7.5%, if allowed under applicable law. *Id.*

On April 24, 2006, the Boytors granted a mortgage to MidAmerica Bank, fsb, on their residential property at 822 Tipperary St. in Gilberts, Illinois. (PX6 at 1, 13). The purpose of the mortgage was to secure the payment of the $203,000 note dated April 24, 2006. *Id.* at 12. The mortgage was recorded by the Kane County Recorder's office on May 3, 2006 and was assigned number 2006K047339. *Id.* at 1.

### 4. Temporary Forbearance Agreement

On January 25, 2007, MidAmerica Bank and the Boytors entered into a temporary forbearance agreement. (DX31 at 238). The forbearance agreement pertained to the $200,000 note and $600,000 note executed on April 20, 2006. *Id.* According to the agreement, an event of default had occurred, in that the Boytors had failed to make the required payments pursuant to the terms of the notes. *Id.* The Boytors accordingly requested, and MidAmerica Bank agreed, to waive any defaults arising solely from the Boytors' failure to pay for a limited period of time, in exchange for the Boytors paying $10,000 to the bank each month during the forbearance period *Id.* at 239.

### 5. American Chartered Bank and the Payoff Letters

In 2008, the Boytors began a lending relationship with a new bank named American Chartered Bank. (5/25/21 Trial Tr. 206:21-207:3). On July 14, 2008, Jacalyn Brennan, an asset manager for National City Bank, issued payoff letters to the Boytors regarding the $200,000 note and the $600,000 note. (DX14 & DX15). On July 31, 2008, the Boytors executed one promissory note with American Chartered Bank for $850,000 and another for $650,000. (DX17 & DX18). National City's records show that, shortly thereafter, the Boytors likely paid off the $600,000 loan. (DX31 at 175; 5/25/21 Trial Tr. 128:1-129:131:16). Although the evidence does not conclusively establish when exactly the $600,000 loan was paid off, the evidence does indicate that the $600,000 loan was paid off. James Hayden, asset manager for PNC, stated that during the National City

merger with MidAmerica in 2009, the bank likely transferred the loan documentation for active loans only. (5/25/21 Trial Tr. 179:14-19). Loan documents relating to the $600,000 note were not passed on, whereas documents relating to the $200,000 note were passed on. *Id.* at 98:20-24. In addition, the $200,000 loan displayed as active and owing on the banks' loan systems. *Id.* at 98:2-9. The Boytors allege that they used the proceeds from the America Chartered Bank loans to pay off the $200,000 note and the $600,000 note, but they did not present any evidence, such as a check, payment receipt, or cancelled loan note indicating that they did indeed use the American Chartered proceeds to pay off the $200,000 note.

### 6. The Release of the $200,000 Mortgage

Yet on August 6, 2008, National City Bank released Mortgage No. 2006K048628, the $200,000 mortgage. (DX19). The mortgage release provided that National City, "in consideration of the payment of the indebtedness secured by the Mortgage Deed hereinafter mentioned, and the cancellation of the note thereby secured, and of the sum of One Dollar, the receipt whereof is hereby acknowledged, does hereby REMISE, CONVEY, RELEASE, and QUIT CLAIM unto Samuel G Boytor and Carol A Boytor . . . all the right, title, interest, claim or demand whatsoever it may have acquired in, through or by [the mortgage.]" *Id.*

Commonly, a bank releases a mortgage once it receives a payoff in full for the underlying debt. (5/26/21 Trial Tr. 90:22-91:2). However, that is not always the case. *Id.* at 91:2. A bank can release a mortgage where a note is still due and owing. One reason a bank might release its collateral, even though the note remains unpaid, is so that a new lender would be able to get a senior lien position on the real estate. (5/25/21 Trial Tr. 98:10-21).

### 7.    Brennan Mistakenly Moves the $203,000 Note to Dead Status

On April 3, 2009, Brennan signed a document titled "Managed Assets Status Change and 1099 Reporting Form." (DX23).  In the synopsis portion of the form, Brennan wrote that the bank erred in booking both the $200,000 note and the $203,000 and consequently recommended the bank "keep the $200,000 note and move the $203,000 note to 'Dead' status." *Id.* at 1.  Brennan's recommendation was approved by Vice President Lon. A. Keast on April 3, 2009. *Id.* at 2.

Generally speaking in the banking industry, a "dead" loan is one that is no longer being pursued for collection. (5/25/21 Trial Tr. 49:17-22).  Designating a loan as "dead" does not mean that the underlying debt is no longer owed, and a bank can still pursue collection on a dead status note. *Id.* at 49:23-50:4, 101:5-14.  The "dead" status is an internal designation used by the bank. *Id.* at 50:5-7.  To externally communicate a forgiven debt, the bank is required to submit a 1099 IRS form. *Id.* at 101:15-19.  There is no record of a 1099 actually being issued by PNC or its predecessors to the Boytors. *Id.* at 101:20-102:13.

Brennan was, moreover, mistaken about the $203,000 note being duplicative. (5/25/21 Trial Tr. 100:23-101:4, 103:12-19).  Both the $200,000 note and the $203,000 note were called for by the settlement agreement. (5/25/21 Trial Tr. 179:5-13; PX2 ¶ 3; PX3 ¶ 2).  The original settlement agreement called for a "junior note in the amount of $200,000 to be secured by a Junior Mortgage . . . against the Commercial Property," as well as a "new note and first mortgage financing in the amount of $405,000 . . . on the personal residence of the Guarantors situated at 822 Tipperary St., Gilberts, Kane County, IL 60136 (the 'Residential Property')." (PX2 ¶¶ 3(b), 3(c)).  The parties amended the settlement agreement and specifically deleted the provision regarding the $405,000 mortgage, deciding instead to enter into a new note for $203,000, to be secured by a second mortgage, leaving the existing first mortgage for the Tipperary property in

13

place. *Id.* ¶ 2. Specifically, the parties agreed to "execute and enter into a new Note, secured by a Second Mortgage on the Residential Property in the principal amount of $203,000[.]" *Id.* However, the settlement agreement's provisions regarding the $200,000 note were not altered by the amendment to the settlement agreement. Thus, the settlement agreement, as modified, called for both a $200,000 note and a $203,000 note. The $200,000 note was to be secured by a junior mortgage against the Boytors' commercial property located at 11N026 Rippburger Road in Plato Center, Illinois, whereas the $203,000 note was to be secured by a second mortgage on the Boytors' residential property located at 822 Tipperary Street in Gilberts, Illinois. A January 16, 2008 email from Jeffrey Ayres, Senior Vice President and Director of Managed Assets, to Brennan and others, further demonstrated that the $200,000 note and $203,000 note were separate and still owing. (DX31 at 98). In the email, Ayres listed the $200,000 note and $203,000 note separately and stated that he would like to invoice the Boytors on a monthly basis for each. *Id.*

**8.     The Note Modification Agreement of the $200,000 Note**

Also on April 3, 2009, Brennan, on behalf of National City Bank, and the Boytors signed a note modification agreement on the $200,000 note. (PX8). As of that time, the $200,000 note had not been paid by the Boytors, as evidenced by the note being live on National City Bank's system, as well as the fact that the bank still possessed the note. (5/26/21 Trial Tr. 88:11-17). The note modification agreement simply extended the maturity date of the $200,000 note to April 3, 2011. (DX31 at 152). The modification agreement provided that "[p]ayments of principal and interest shall continue to be payable as provided for in the Note[.]" (PX8 ¶ 2). By signing the note modification agreement, the Boytors ratified and confirmed all of the terms of the $200,000 note "not specifically amended" by the modification, as well as "all of those terms and conditions of all other documents between [the Boytors] and [the bank] pertaining to the indebtedness evidenced

14

by the Note." (PX8 ¶ 3). In addition, the note modification agreement provided that the modification did not "constitute a waiver or novation of the Note or any term thereof." *Id.*

In connection with the loan modification agreement, in July 2009, Brennan and the Boytors signed a Loan Settlement Statement and Borrower's Authorization, which listed various transaction fees that would be incurred by National City Bank, including a mortgage recording fee, flood determination fees, property report fees, and a tax service fee, totaling $372.00. (DX31 at 121). The Boytors sent a check to National City for that amount on June 11, 2009. *Id.* at 123.

### 9.   The New Mortgage Securing the $200,000 Note

Eventually it was discovered that the original mortgage securing the $200,000 note had been erroneously released, so National City Bank sought a new mortgage from the Boytors. (5/26/21 Trial Tr. 109:23-110:25). Indeed, internal bank documents showed that the full $200,000 remained due and unpaid as of July 2009. (DX31 at 108). On July 8, 2009, the Boytors granted a mortgage to National City Bank on the Boytors' residential property at 822 Tipperary Street in Gilberts, Illinois to secure the payment of the $200,000 note dated April 20, 2006. (DX25 at 1, 12, 13).

### 10.   The Banks' Correspondence with the Boytors Regarding Defaults

On several occasions, PNC and its predecessor sent letters to the Boytors regarding their failure to make payments on the $200,000 and $203,000 notes. For instance, on January 15, 2009, Brennan, then Vice President of National City Bank, which had become a part of PNC, wrote a letter advising the Boytors that they were in default for the $203,000 note, as they had failed to make payment when due. (DX31 at 155). A similar letter was prepared by PNC on August 9, 2010. *Id.* at 158. Internal bank records as of January 15, 2010 showed that the Boytors still owed

$203,000 on the note. *Id.* at 174. The customer balance for the $200,000 note likewise showed that as of June 6, 2013, the Boytors still owed $200,000 on that note. *Id.* at 180. In March 2014, September 2016, and October 2016, counsel for PNC sent letters to the Boytors regarding their default of the $200,000 note. *Id.* at 194-207.

### 11. Hayden Acquires the Boytors' Loan File and Pursues Collection of the $203,000 Note

In 2017, Hayden acquired the Boytors' loan file. On June 27, 2017, Hayden emailed Joseph Lombardo, a colleague at PNC, writing:

> I have a problem that I am hoping you can help me with. I just recently was transferred a deal for Carol and Samuel Boytor. This is an old Mid-America/National City relationship that has been [a] mess up for the last 10+ years. We have released collateral that we shouldn't have and apparently cancelled a note that we shouldn't have. That is where you come in. I have attached a note cancellation from 2008. It appears to state that it is non-reportable and cancelled because it was booked in error. In reality, it was not booked in error and was a valid note. I am hoping to determine whether we sent a 1099c or not as that would determine whether we may still be able to pursue the note.

(DX31 at 183). The mistakenly cancelled note discussed with Lombardo in the email was the $203,000 note, which Brennan had accidentally moved to "dead" status. (5/25/21 Trial Tr. 133:8-15). After receiving Hayden's email, Lombardo researched PNC's 1099 database but did not find a 1099 for the Boytors. (DX31 at 182). Lombardo therefore reached out to PNC's tax department to confirm that there was no 1099C for ART debt forgiveness issued to the Boytors, specifically asking the department to check from the 2008 to 2015 tax years. *Id.* Laurie Braden in PNC's tax department responded that there was nothing on file for the Boytors. *Id.* Hayden consequently decided to proceed with filing suit against the Boytors, writing: "As we did not issue a 1099, I am going to proceed with filing suit and foreclosure on the note. I was pretty sure the cancellation

was just internal. In reality, the borrower still owes the money." *Id.* at 185. The Boytors did not present any evidence indicating that a 1099 had been issued to them by PNC or its predecessors.

### 12. PNC Files Suit against the Boytors

On June 15, 2018, PNC sued the Boytors for defaulting on the $200,000 and $203,000 notes. In Count I of the complaint, PNC seeks to foreclose the mortgage securing the $203,000 note, recorded as 2006K047339. Doc. [1]. In Count II, PNC seeks a money judgment for the breach of the $200,000 promissory note. *Id.* As of May 3, 2021, Hayden calculated the payoff amount for the $200,000 note as follows:

- $200,000 Note:
    - Principal – $200,000
    - Interest since Maturity – $154,375
    - Total – $354,375
    - Per Diem - $41.666667

(PX10).

## III. CONCLUSIONS OF LAW

### A. Jurisdiction

As the parties concede, the Court has original jurisdiction of this civil action because the matter in controversy exceeds the value of $75,000, and is between citizens of different states. 28 U.S.C. § 1332(a)(1). PNC is a national banking association with its main office located in Pennsylvania, whereas the Boytors are citizens of Illinois.

### B. Burdens of Proof

In this diversity suit, Illinois law governs PNC's claims and the Boytors' affirmative defenses. *Taylor v. Kilmer*, No. 18 C 7403, 2021 WL 76828, at *2 (N.D. Ill. Jan. 8, 2021) (collecting cases). Under Illinois law, it is generally the plaintiff's burden in a civil action to prove

its case by a preponderance of the evidence. *Gataric v. Colak*, 2016 IL App (1st) 151281, ¶ 17, 59 N.E.3d 109, 114 (citing *In re Parentage of Rogan M.*, 2014 IL App (1st) 141214, ¶ 5, 385 Ill. Dec. 582, 19 N.E.3d 140). The preponderance of evidence standard is a lesser burden than that of clear and convincing evidence or beyond a reasonable doubt. *See People v. Craig*, 403 Ill. App. 3d 762, 768, 934 N.E.2d 657, 663 (2010) (citations omitted). To satisfy the preponderance standard, the proponent must simply show that a fact at issue is more likely than not true. *See Burgess v. Illinois State Bd. of Educ.*, 2020 IL App (3d) 170076, ¶ 68, 144 N.E.3d 110, 127, *appeal denied*, 147 N.E.3d 709 (Ill. 2020) (citation omitted).

Of course, the defendants bear the burden of proving their affirmative defenses, also by a preponderance of the evidence. *See Andrews v. Metro. Water Reclamation Dist. of Greater Chicago*, 2019 IL 124283, ¶ 23, 160 N.E.3d 895, 904; *RH Fund XIII, LLC v. Gizynski*, 2018 IL App (1st) 181169-U, ¶ 34.

## C. Count I – Foreclosure of $203,000 Mortgage

In its complaint, PNC seeks to foreclose on the mortgage securing the payment of the $203,000 note, pursuant to 735 ILCS 5/15-1101. Doc. [1] ¶ 20. Under Illinois law, a mortgagee, such as PNC, "may foreclose its interest in real property upon 'either the debt's maturity or a default of a condition in the instrument.'" *PNC Bank, Nat. Ass'n v. Zubel*, 2014 IL App (1st) 130976, ¶ 18, 24 N.E.3d 869, 874 (quoting *Heritage Pullman Bank v. American National Bank & Trust Co. of Chicago*, 164 Ill.App.3d 680, 685, 115 Ill. Dec. 706, 518 N.E.2d 231 (1987)). A mortgagee establishes a *prima facie* case for foreclosure by introducing the mortgage and underlying note, "after which the burden of proof shifts to the mortgagee to prove any applicable affirmative defense." *Id.* (citations omitted). Under Illinois' foreclosure statute, 735 ILCS 5/15-1504, a foreclosure complaint must include a copy of the mortgage and a copy of the note secured

thereby as exhibits. 735 ILCS 5/15-1504(a)(2). The foreclosure law also requires that the complaint spell out certain details about the mortgage, including a "statement as to defaults, including, but not necessarily limited to, date of default, current unpaid principal balance, per diem interest accruing, and any further information concerning the default." 735 ILCS 5/15-1504(a)(3)(j). And in the trial of a foreclosure action, "the evidence to support the allegations of the complaint shall be taken in open court[.]" 735 ILCS 5/15-1506(a).

### 1. PNC Has Proven Count I by a Preponderance of the Evidence

Here, PNC satisfied its initial burden by: (a) appending the mortgage and underlying $203,000 note to its complaint; and (b) providing the mortgage information required by 735 ILCS 5/15-1504(a)(3). Significantly, PNC pleaded the details of the Boytors' default, explaining that the Boytors failed to pay off the monies owed on the loan by the maturity date of April 3, 2009. Doc. [1] ¶ 21(j)(1). PNC also included the unpaid principal balance of $203,000, the total amount due with interest as of the date of the complaint, as well as the per diem rate of the note. *Id.* ¶¶ 21(j)(2)-(4).

Then, at trial, PNC presented "the evidence to support the allegations of the complaint[.]" 735 ILCS 5/15-1506(a). PNC demonstrated that it held a mortgage on the Boytors' residential property located at 822 Tipperary Street in Gilberts, Illinois which secured the payment of the $203,000 note.[5] (PX6 at 1, 12). PNC proved, too, that the underlying $203,000 note became due on April 3, 2009, and that the failure to pay $203,000 by that date constituted an "Event of Default" under the note. (PX5 at 1). In terms of the applicable interest rate, PNC showed that the interest rate on the loan would be 0% until after an event of default, at which point the interest rate could be increased by the bank to 7.5%, if permitted by applicable law. *Id.*

---

[5] The Boytors do not contest PNC's standing to pursue collection of the notes in this case. (5/25/21 Trial Tr. 73:17-74:10).

Most importantly, PNC showed that the Boytors defaulted on the note by never paying the $203,000 balance. Hayden testified credibly that after reviewing the Boytors' file in 2017, he learned that the $203,000 note was in default due to failure to pay the principal owed by the date of maturity. (5/25/21 Trial Tr. 76:5-24, 81:13-82:5). His testimony was corroborated by, among other things, Brennan's 2009 attempt to collect on the $203,000 note, (DX31 at 155), internal bank records as late as 2010 showing that the Boytors had not paid the $203,000 balance, *id.* at 174, as well as Hayden's investigation into whether a 1099 was ever issued to the Boytors on the $203,000 note. *Id.* at 182-185. The Court therefore finds that PNC has established by a preponderance of the evidence the allegations in the foreclosure count of its complaint, namely that PNC holds the mortgage securing the $203,000 note, which the Boytors defaulted by failing to pay the principal by the maturity date.

### 2.     The Boytors Have Failed to Prove Their Affirmative Defenses on Count I

The Boytors raise two affirmative defenses in connection with Count I: (1) lack of consideration; and (2) payment. For the reasons discussed below, the Boytors have not shown either defense by the preponderance of the evidence.

#### a.     Lack of Consideration

The Boytors' first defense is that there was no consideration for the $203,000 note and mortgage. Doc. [145] at 21-27. "It is a basic tenet of contract law that in order for a promise to be enforceable against the promisor, the promisee must have given some consideration for the promise." *Vassilkovska v. Woodfield Nissan, Inc.*, 358 Ill.App.3d 20, 294 Ill. Dec. 207, 830 N.E.2d 619, 624 (2005) (citation omitted). In Illinois, "consideration is relatively easy to show." *LKQ Corp. v. Thrasher*, 785 F. Supp. 2d 737, 742 (N.D. Ill. 2011) (citation omitted). So long as a party

"receives something of value in exchange for [the party's] promise or detriment, the courts will not inquire into the adequacy of the consideration." *Id.*

The Boytors contend that the note and mortgage for $203,000 was "not a new obligation but instead was created to replace the Note for $200,000." Doc. [145] at 21. According to the Boytors, they owed no money to the bank after the execution of the April 20, 2006 notes, so the subsequent $203,000 note and mortgage would have required separate consideration to be valid. *Id.* at 27. The Boytors are wrong on both counts.

To begin, the $203,000 note was not duplicative of the $200,000 note. The Boytors emphasize that Brennan marked the $203,000 note as "dead" in an internal document back in 2009, in which she stated that there should have just been one note for $203,000 (not one for $203,000 and $200,000) and that "[i]n error, both notes got booked[.]" Doc. [145] at 21-22 (citing DX 23). However, Brennan testified credibly at trial that her 2009 interpretation of the Boytors' file was erroneous and that there were two separate notes, one for $200,000 and one for $203,000. (5/26/21 Trial Tr. 79:19-82:7; 110:21-111:8). As Brennan testified, she was not involved in the negotiations for the settlement agreement or the amendment to the settlement agreement. *Id.* at 68:11-21. It is therefore reasonable that Brennan was unaware that the settlement agreement, as amended, required both the $200,000 note and $203,000 note. The Boytors urge the Court to disregard Brennan's "intentionally altered" testimony, Doc. [145] at 22, but the documents in this case support her version of events. The March 10, 2006 settlement agreement called for a $200,000 note to be secured by a junior mortgage on the Boytors' commercial Rippburger property and a $405,000 note to be secured by a first mortgage on the Boytors' residential Tipperary property. (PX2 ¶¶ 3(b), 3(c)). The parties then amended the settlement agreement on April 21, 2006. (PX3). In the amendment, the parties changed the settlement deadline to April 24, 2006, deleted the

21

provision from the original settlement agreement regarding the $405,000 mortgage, and agreed to "execute and enter into a new Note, secured by a Second Mortgage on the Residential Property in the principal amount of $203,000[.]" (PX3 ¶¶ 1, 2). All other provisions of the original settlement agreement remained unaltered. In accordance with the amendment, the parties then entered into a separate note and mortgage for $203,000. (PX5; PX6). In short, the settlement agreement, as modified, called for both the $200,000 note (to be secured by the Boytors' commercial Rippburger property), and the $203,000 note (to be secured by the Boytors' residential Tipperary property). The notes and mortgages themselves reflect their distinct nature too. (PX4; PX5; DX5; PX6).

The Boytors point to other evidence that they claim establishes the duplicative nature of the $203,000 note, but the Court does not find that any of the proffered evidence shows that the $203,000 note was meant to replace the $200,000 note. The Boytors initially point to Samuel Boytor's "unrebutted sworn" testimony. Doc. [145] at 21. At trial, Mr. Boytor testified that he thought the $203,000 note was "a mistake," and that he had "no idea where it came from." (5/25/21 Trial Tr. 203:19-204:4). Mr. Boytor further stated that he had a conversation with Brennan, in which she told him "that this thing was messed up and she double booked it[.]" *Id.* at 204:5-9. According to Mr. Boytor, it was his understanding that Brennan "said it was financing and interest or something recalculating it came out to 203." *Id.* at 204:10-12. Mr. Boytor's testimony on the $203,000 note is not credible. Mr. Boytor is a well-educated and sophisticated businessperson. It is evident, both from his educational background and the last-minute, handwritten edits to the agreements and notes in the record, (*see, e.g.*, PX5 at 1; PX6 at 8), that he paid close attention to the documents he signed. Mr. Boytor's claim that he has "no idea" where the $203,000 note and mortgage came from is belied by the fact that he signed the amendment to the settlement agreement which explained the genesis of the $203,000 note and mortgage—the

parties decided to keep the remaining first mortgage on the Tipperary property in place and sign a new note for $203,000, to be secured by a second mortgage on the Tipperary property. (PX 3). Mr. Boytor then went on to sign the $203,000 note and mortgage, at which time, he specifically negotiated for a 15-day cure period to resolve any default in payment. (PX5 at 1; PX6 at 8; 5/25/21 Trial Tr. 41:1-45:4).  Put another way, Mr. Boytor negotiated and executed no fewer than three legal documents establishing his obligation to pay the bank $203,000, so his claim now that the $203,000 note was a mistake is not believable.

The Boytors next direct the Court to some confusing math. Doc. [145] at 22-23.  They argue that the $203,000 note cannot be valid because that would mean the Boytors agreed to pay more than the $1.2 million they owed under the settlement agreement. *Id.*  Essentially, they aver that because $300,000 + $600,000 + $200,000 + $203,000 equals more than $1.2 million, the $203,000 must be duplicative. *Id.* at 23.  The Boytors' math contention, however, oversimplifies and misreads the settlement agreement.  The settlement agreement was a restructuring of the at least $1.2 million of debt owed by Fox Controls and Safe-T-Sense to Mid America and guaranteed by the Boytors.  According to the language of the settlement agreement, a contemporaneous memo from the Boytors' lawyer, the amendment to the settlement agreement, the disbursement form for the $600,000 note, and Hayden's testimony, the math of the settlement agreement was as follows:

- At the time of the settlement agreement, Fox Controls and Safe-T-Sense owed Mid America around $1.2 million, referred to as the "Borrower Obligations" in the settlement agreement.
- The Boytors arranged to get a loan from Minarik, who would pay Mid America $300,000 to reduce the Borrower Obligations, bringing the Borrower Obligations to $900,000 ($1,200,000 - $300,000 = $900,000).
- The Boytors and MidAmerica agreed to enter into a new note and mortgage for $600,000 on the commercial Rippburger property, but the total proceeds of the new note were not applied to reduce the Borrower Obligations.  Instead, the proceeds first went to paying off the existing mortgage on the property.[6]  The disbursement form for the $600,000 note

---

[6] PNC entered the existing Rippburger mortgage, No. 1999K066778, into evidence. (PX16).

showed that only $31,309.35 from the $600,000 note actually went to paying down the Borrower Obligations, reducing them to $868,690.65 ($900,000 - $31,309.35 = $868,690.65).

- The Boytors and Mid America also agreed to enter into a $200,000 junior note to be secured by a junior mortgage on the commercial Rippburger property, thereby reducing the Borrower Obligations to $668,690.65 ($868,690.65 - $200,000 = $668,690.65).

- The original settlement called for the execution of a $405,000 note to be secured by a first mortgage of the Boytors' residential Tipperary property. The proceeds were to first pay off the existing mortgage on the property. The amendment to the settlement agreement indicated the first mortgage had a principal balance of $177,000. Then, from the remaining proceeds, $35,000 was to be paid and distributed to the Boytors, with the remaining amount, $193,000, to be applied to the Borrower Obligations, reducing them to $475,690.65 ($668,690.65 - $193,000 = $475,690.65).

- Finally, Mid America would forgive or "take a haircut" on the remaining Borrower Obligations, which Hayden estimated to be between $400,000 and $500,000, reducing the Borrower Obligations to $0 ($475,690.65 - $475,690.65 = $0).

(5/25/21 Trial Tr. 165:6-174:22; PX2; PX3; DX1; DX31 at 263).

The major point of contention concerning the above calculation surrounds the $600,000 note. The Boytors aver that the entire proceeds from the $600,000 went to paying down the debt of Fox Controls and Safe-T-Sense. Doc. [145] at 23. However, the evidence at trial demonstrated that less than $50,000 from the $600,000 note went to paying down the $1.2 million of debt. The settlement agreement specified that the bank and the Boytors would "execute and enter into [a] new note and first mortgage financing in the amount of $600,000 . . . to be secured by the commercial building of the Guarantors situated at 11N026 Rippburger Rd . . . and shall apply all of the net proceeds from such refinance (*after pay-off [of] the existing first mortgage*) to the further reduction of the Borrower Obligations due Lender." (PX2 ¶ 3(a) (emphasis added)). A contemporaneous legal memorandum authored by the Boytors' lawyer confirmed that the proceeds of the $600,000 note were first to be applied to the existing mortgage on the Rippburger property: "The Bank will refinance the commercial building with a new first mortgage in the amount of $600,000.00. These loan proceeds will be used to pay $550,000 owed to the Bank on the existing

mortgage, leaving net refinance proceeds of $50,000. This net $50,000 will be paid to the Bank to further reduce the [obligations]." (DX1 at 2). Hayden likewise testified that only approximately $50,000 from the $600,000 note would be applied to the Fox Controls and Safe-T-Sense debt. (5/25/21 Trial Tr. 169:17-25, 174:25-6, 175:4-14). The disbursement form for the $600,000 note actually demonstrates that only $31,309.35 ended up going toward the Fox Controls and Safe-T-Sense debt, as $558,617.29 was disbursed as "Payoff for loan #13-260577-2," $1,274.00 went to tax service fees and other charges, and $8,799.36 of the proceeds went to Escrow Reserve. (DX31 at 263; *see also id.* at 280, 298). When Mr. Boytor was shown this disbursement form on cross examination, he did not disagree or attempt to refute the document. (5/26/21 Trial Tr. 12:13-14:4). Instead, he agreed that the disbursements and charges in the form added up to $600,000, acknowledged that the form stated that only $31,309.35 of the $600,000 note was going to the Fox Controls settlement, and confirmed that he had signed the disbursement. *Id.* Mr. Boytor also confirmed that the loan number listed in the disbursement form for the $558,617.29 payoff was the loan number provided on the Rippburger property that he had granted the bank in 1999. (5/26/21 Trial Tr. 24:10-28:10; PX16). Mr. Boytor offered no explanation of how, given the settlement agreement and disbursement form, more than $31,309.35 from the $600,000 note could have been used to reduce the $1.2 million debt of Fox Controls and Safe-T-Sense. As a result, the Court finds that only $31,309.35 from the $600,000 note went towards the $1.2 million debt, and that the calculation above reflect the terms of the settlement agreement.

The terms of the deal were slightly altered by the amendment to the settlement agreement, through which the parties deleted the provision regarding the $405,000 note and first mortgage on the Tipperary property, opting instead for a $203,000 note, to be secured by a second mortgage on the Tipperary property. (PX2; PX3). From the $203,000 note, the proceeds "necessary to pay the

Buyer's title insurance, escrow closing charges, recording fees, and real estate tax escrow on the Commercial Property," would go to those costs, and the remainder would be applied to reducing the Borrower Obligations. (PX3 ¶¶ 2(i)-(ii)). As such, the amendment to the settlement agreement changed the math to: $300,000 from the Minarik payment; $31,309.35 from the $600,000 note; $200,000 from the junior mortgage on the Rippburger property; approximately $203,000 from the second mortgage on the Tipperary property; and somewhere from $400,000 to $500,000 forgiven by Mid America. As a result, the execution of the $203,000 note did not mean that the Boytors paid more than $1.2 million to pay off the debt of Safe-T-Sense and Fox Controls. At most, the Boytors reduced the obligations of Fox Controls and Safe-T-Sense to $734,309.35 ($300,000 + $31,309.35 + $200,000 + 203,000 = $734,309.35). The Boytors' misleading math argument therefore misses the mark.

In the Boytors' next argument, they direct the Court to letters and emails that allegedly prove the $203,000 note was meant to replace the $200,000 note. The Boytors first cite to two Reining emails and a Mid America loan committee document from before the amendment to the settlement agreement. *See* Doc. [145] at 23 (citing DX2; DX32 at 60; DX3). According to the Boytors, because the documents do not mention the $203,000 note, that means the $203,000 note did not exist. *Id.* However, the parties did not agree to the $203,000 note and mortgage until the signing of the settlement agreement amendment on April 21, 2006, so it is not surprising or telling that documents from before that date do not mention the $203,000 note or mortgage.

Even the Boytors' cited documents from after the execution of the $203,000 note and mortgage do not establish the invalidity of the $203,000 note. For instance, the Boytors refer to an email exchange among National City employees, in which one employee wrote "there are two credit facilities for the Boytors," referring to the $200,000 and $600,000 notes. Doc. [145] at 23

(citing DX12). While the email does contain that language, the email chain also refers to the loan numbers for both the $203,000 loan (200601395) and $200,000 loan (200601098) in the subject line, so the email exchange hardly shows that the $203,000 loan does not exist. (DX12).[7] Brennan's payoff letters from 2008 for the $200,000 and $600,000 notes do not prove that there was no $203,000 note either; as Brennan credibly testified at trial, she was mistaken when she believed the $203,000 note and the $200,000 were duplicative. (5/26/21 Trial Tr. 79:19-82:7; 110:21-111:8). PNC's letters to the Boytors seeking collection of the $200,000 note, likewise, do not show that the $203,000 note was invalid. *See* Doc. [145] at 23 (citing DX15 & DX16). This is because the Boytors fail to consider the collection letters that the bank sent regarding the $203,000 note in January 2009[8] and August 2010. (DX31 at 155, 158). In sum, the documents selected by the Boytors do not "support the conclusion that the Note for $203,000 replaced the note for $200,000 and was not a new obligation." Doc. [145] at 23.

The Boytors finally allege that they performed all that was required by the settlement agreement by April 20, 2006, so that as of that date, "the Boytors, Fox Controls and Safe-T-Sense owed no monies to the plaintiff for anything prior to April 20, 2006." Doc. [145] at 27. Anything happening after April 20, 2006, according to the Boytors, therefore required "new consideration" and "could not rely upon old consideration based upon the fact the Boytors or Fox Controls or

---

[7] The 2008 email exchange additionally reflected the challenges and confusion National City Bank employees faced in understanding the Boytors' loan file after its merger with Mid America. (DX12). Essentially, the bank employees were emailing each other to try to figure out the Boytors' file. As such, the National City Bank employee's email statement in that chain that "it appears there are two credit facilities for the Boytors, a $600,000 first mortgage and a $200,000 second mortgage," is not weighty evidence on the validity of the $203,000 note. The employee was not involved in the negotiation of the settlement agreement or amendment to the settlement agreement and based his "credit facilities" assessment on a memorandum authored by Reining prior to the actual settlement agreement and amendment to the settlement agreement. (DX12 at 1).

[8] It is not clear why Brennan sent a letter to the Boytors to collect on the $203,000 note prior to its maturity date of April 3, 2009. (*See* DX31 at 155). Yet, the Court still finds the letter to demonstrate, at the very least, that the bank believed the $203,000 note to be valid and unpaid as of that time.

Safe-T-Sense previously owed them monies." *Id.* The Boytors assert that PNC did not provide any consideration to the Boytors on April 24, 2006 in connection with the $203,000 note because no money was disbursed to the Boytors, and because PNC "did not do anything to its detriment that would establish consideration." *Id.*

The Boytors' timing argument is, first and foremost, at odds with the language of the settlement agreement and the amendment to the settlement agreement. Contrary to the Boytors' reading of the document, the settlement agreement did not state that once the $300,000 payment from Minarik was paid to Mid America, the Boytors owed no money for loans that existed before April 20, 2006. Instead, the settlement agreement restructured the debt owed by Safe-T-Sense and Fox Controls, so that the debt was to be paid by the Boytors through the $300,000 Minarik payment, a portion of the $600,000 note and mortgage, the $200,000 note and mortgage, and a portion of the $405,000 note and mortgage. (PX2). The settlement agreement specifically provided that "after the satisfaction of the obligations . . . under this Agreement, the sole and exclusive obligations of the Guarantors to the Lender shall be only under and with respect to (i) the Commercial Refinancing Indebtedness [the $600,000 first mortgage financing], (ii) the Commercial Junior Mortgage Indebtedness [the $200,000 junior mortgage financing], and (iii) the Residential Refinancing Indebtedness [the $405,000 first mortgage financing]." (PX2 ¶¶ 3(a)-(e), (f). Then the settlement agreement was amended on April 21, 2006. (PX3). In that amendment, the parties agreed to: (a) extend the deadline to execute the deal to April 24, 2006; (b) keep and abide by the existing first mortgage with a principal balance of approximately $177,000 on the Tipperary property; and (c) replace the $405,000 note and mortgage called for in the original settlement agreement with a $203,000 note and mortgage, to be referred to as the "Residential Refinancing Indebtedness," just as the $405,000 note had been in the original settlement

agreement. *Id.* So the letter of the settlement agreement, as amended, showed that: the settlement agreement could be executed as late as April 24, 2006, and that the Boytors agreed to execute and enter into a $203,000 note to be secured by a second mortgage on the Tipperary property. *Id.* The parties, further, executed the $203,000 note and mortgage by the April 24, 2006 settlement deadline. (DX5 & DX6). Thus, the Boytors' argument that the transaction was completely closed by April 20, 2006 does not wash with the very terms of the settlement agreement, as amended.[9]

Along those same lines, the settlement agreement includes its amendment, and the Court reads the document as a whole. *See Mitchell/Roberts P'ship v. Williamson Energy, LLC*, 2020 IL App (5th) 190339, ¶ 79, 164 N.E.3d 77, 93, *appeal denied*, 163 N.E.3d 741 (Ill. 2021) (citations omitted) ("Illinois law establishes that an instrument is to be interpreted as a whole, and when amendments are made, courts consider all parts of the agreement to determine the intent of the parties."). Thus, the execution of the $203,000 note and mortgage, called for by the amendment to the settlement agreement, and completed by the settlement deadline of April 24, 2006, was called for and timely under the settlement agreement. Put another way, the amendment to the settlement agreement *is* the settlement agreement, not a new agreement requiring separate consideration.

Even if the documents executed on April 24, 2006 required new consideration, they had it. In the amendment to the settlement agreement, the parties acknowledged that they received "good and valuable consideration" for the agreement. (PX3 at 1). In addition, the Boytors and the bank each got something of value out of the amendment, the $203,000 note, and the $203,000 mortgage. *See Bires v. WalTom, LLC*, 662 F. Supp. 2d 1019, 1028 (N.D. Ill. 2009) (quoting *Cincinnati Ins.*

---

[9] In support of their timing argument, the Boytors cite a release deed executed by the bank on April 21, 2006. *See* Doc. [145] at 25 (citing DX31 at 253-54). However, the document cited pertains to the release of mortgages entered into in 1999 and has nothing to do with the notes and mortgages at issue in this case. The Court therefore declines to give any weight to the document.

*Co. v. American Hardware Mfrs. Ass'n*, 387 Ill.App.3d 85, 325 Ill. Dec. 483, 898 N.E.2d 216, 230 (2008)) ("Any act or promise that benefits one party or disadvantages the other is sufficient consideration to support the formation of a contract.").

The Boytors claim that they did not receive anything of benefit because the funds from the $203,000 note were not disbursed to them. However, a consideration benefit is not limited to the receipt of money. *Doyle v. Holy Cross Hospital*, 186 Ill.2d 104, 237 Ill. Dec. 100, 708 N.E.2d 1140 (Ill. 1999) (citation omitted) ("Consideration consists of some detriment to the offeror, some benefit to the offeree, or some bargained-for exchange between them."). The proceeds of the $203,000 note first went to paying off the closing expenses for the $203,000 mortgage. (PX3). The remainder of the proceeds went to reducing the debt incurred by Fox Controls and Safe-T-Sense, debt which was guaranteed by the Boytors. (PX2 & PX3). In short, Fox Controls and Safe-T-Sense were delinquent in their obligations to the bank, and the $203,000 note proceeds funded the closing expenses on the mortgage and paid down the debt guaranteed by the Boytors. Under the terms of the $203,000 note, the Boytors gained three more years to pay off the bank, with no payments owed until April 2009, with zero percent interest until the maturity date. (PX5). As such, the Boytors' claim that they "received absolutely nothing from the plaintiff" is incorrect. Doc. [145] at 27. The Boytors are also wrong in stating that the bank "did not do anything to its detriment[.]" *Id.* The bank paid itself temporarily for the debt guaranteed by the Boytors and agreed to a zero percent interest loan, giving the Boytors an additional three years to actually pay the bank for the debt of Fox Controls and Safe-T-Sense. The low threshold for consideration was accordingly satisfied in this case.[10]

---

[10] Under Illinois law, furthermore, a validly executed negotiable instrument, such as a promissory note, is presumed to have consideration. *See JPMorgan Chase Bank, N.A. v. Asia Pulp & Paper Co.*, 707 F.3d 853, 866 (7th Cir. 2013) (citing *Pedott v. Dorman*, 192 Ill.App.3d 85, 139 Ill. Dec. 156, 548 N.E.2d 541, 546 (1989)).

### b.     Payment

The Boytors' second affirmative defense in connection with Count I is payment.  The Boytors provide two bases for their payment defense, neither of which shows that the Boytors paid the $203,000 note.  First, the Boytors argue that PNC admitted receiving $203,000 on April 24, 2006 because a disbursement request and authorization form from that time stated that "$203,000 [was] paid to MidAmerica in settlement of Fox Controls, Inc. obligations." Doc. [145] at 25, 28 (citing PX15).  Second, the Boytors argue that the $203,000 note was paid by the releases executed by the bank in 2008. *Id.*

The Boytors' first, funds-disbursement argument contravenes the language of the settlement agreement and the $203,000 promissory note.  The $203,000 note was part a refinancing of a prior debt.  As spelled out in the amended settlement agreement, the funds from the $203,000 promissory note went first to paying the closing fees for the accompanying mortgage, and then to paying down the debt accumulated by Fox Controls and Safe-T-Sense. (PX3).  In simpler terms, in exchange for the $300,000 payment from Minarik, the bank restructured the debt guaranteed by the Boytors, paying itself temporarily to reduce the Borrower Obligations, and allowing the Boytors three additional years to actually pay the bank.  Under the express terms of the promissory note, the Boytors agreed to pay $203,000 to the bank by April 3, 2009. (PX5).  The fact that the disbursement documentation indicated that the funds were paid to Mid America in settlement of the Fox Controls obligations does not mean that the bank was paid for the $203,000 note.  Indeed, Reining testified that no new funds were advanced for the $203,000 note, and that the $203,000 note proceeds were "advanced in settlement of the Fox Controls' debt." (5/25/21 Trial Tr. 61:1-62:10).  The Boytors' argument on this point is meritless.

The Boytors' second payment argument with respect to the $203,000 note fares no better. On August 6, 2008, National City Bank executed four releases: (1) the release of the $200,000 mortgage on the Rippburger property (Mortgage No. 2006K048628); (2) the release of the $600,000 first mortgage on the Rippburger property (Mortgage No. 2006K048626); (3) the release of the $600,000 assignment of rents (Assignment of Rents No. 2006K048627); and (4) the release of the $200,000 assignment of rents (Assignment of Rents No. 2006K048629). (DX5; DX6; DX7; DX8; DX19; DX20; DX21; DX30). Each release was a standard form utilized by the bank which included the following language: "National City . . . for and in consideration of the payment of the indebtedness secured by the Mortgage Deed hereinafter mentioned . . . does hereby REMISE, CONVEY, RELEASE, and QUIT CLAIM unto Samuel G Boytor and Carol A Boytor . . . all the right, title, interest, claim or demand whatsoever it may have acquired in, though or by a certain Mortgage Deed[.]" (DX19 at 1; DX20 at 1; DX21 at 1; DX30 at 1; 5/25/21 Trial Tr. 180:2-23). The Boytors assert that the term "indebtedness" in the releases is one in the same as the defined term of "Indebtedness" included in each mortgage. Doc. [145] at 28. In each mortgage, the term "Indebtedness" is defined rather broadly and includes language regarding the possible cross-collateralization of loans. (*See, e.g.*, DX5 at 12). The Boytors accordingly maintain that by stating that the release is made in consideration of the "payment of the indebtedness secured by the Mortgage Deed," that all of the outstanding obligations of the Boytors have been paid, including the $203,000 note. Doc. [145] at 28.

Once again, the Boytors' argument is at odds with the language of the documents. From the outset, the uncapitalized term "indebtedness" in the consideration clause of the release does not invoke the capitalized definition of "Indebtedness" from the mortgages and assignment of rents. Rather, the clause in the release refers to the "indebtedness *secured by the Mortgage Deed*

*hereinafter mentioned*," which is specific to the mortgage or assignment of rents being released, i.e., the $200,000 mortgage, the $600,000 mortgage, the $200,000 assignment of rents, and the $600,000 assignment of rents. There was no release of the $203,000 mortgage, so the clause is inapplicable. Also, as will be discussed further below, the consideration recital of each of these releases is not controlling. See *infra*, at 40-42. As Hayden and Brennan credibly testified, a bank may release the collateral of a loan without having been actually paid for the underlying note. (5/25/21 Trial Tr. 97:1-97:5, 98:10-21,180:2-23; 5/26/21 Trial Tr. 89:1-91:4). Here, despite the language in each of these releases, the record shows that the Boytors did not pay off the $200,000 loan or the $203,000 loan. Thus, the Boytors have failed to show that it was more likely than not that the Boytors paid off the $203,000 note.

Other documents in the record, furthermore, demonstrate that the $203,000 note was never paid. For instance, on August 9, 2010, PNC sent a letter advising the Boytors that they were in default for the $203,000 note, as they had failed to make payment when due. (DX31 at 158). Internal bank records as of January 15, 2010, likewise, showed that the Boytors still owed $203,000 on the note. (DX31 at 174). These documents, in combination with the testimony of Hayden stating that PNC's loan system showed that the $203,000 note was due and outstanding, (5/25/21 Trial Tr. 81:13-82:5),[11] demonstrate that the $203,000 note was never paid. And because the Boytors have not offered any evidence that the note was actually paid, such as a copy of a check, check stub, payment receipt, or withdrawal record, they have failed to establish a defense

---

[11] The Boytors contend that the testimony regarding which loans are active on the bank's system should be disregarded under the best evidence rule. Doc. [147] at 12-13. The Boytors' best evidence rule fails for at least two reasons. First, the Boytors failed to make the objection during the trial, so their objection under the best evidence rule is waived. *See* Fed. R. Evid. 103(a). Second, the best evidence rule concerns the requirement of an original writing to prove the content of the writing. Fed. R. Evid. 1002. Here, Hayden's testimony about the bank's loan system is not an attempt to prove the writings of a particular document. Rather his testimony concerns the status of the Boytors' loans with the bank. Thus, the best evidence rule does not apply.

overcoming PNC's showing of nonpayment. *See Bank of New York Mellon v. Holmes*, No. 14-CV-04440, 2018 WL 1586240, at *4 (N.D. Ill. Apr. 2, 2018); *Wells Fargo Bank, N.A. v. YP Trillium, LLC*, 2013 IL App (1st) 121389-U; *MB Fin. Bank v. Sweiss*, No. 1-10-1710, 2011 WL 10069462, at *4 (Ill. App. Ct. Mar. 2, 2011).

The Court's finding that the Boytors failed to pay the $203,000 note rests on the Court's credibility determinations as well. *See Richardson v. Kubiesa*, No. 98-C-2362, 2004 WL 2583958, at *3 (N.D. Ill. Nov. 10, 2004) (citing *United States v. Woods*, 233 F.3d 482, 484 (7th Cir. 2000)). Hayden testified that the $203,000 note remained unpaid as of 2017 when he acquired the Boytors' file. (5/25/21 Trial Tr. 76:5-24, 81:13-82:5). Hayden further testified that he took steps to determine whether a 1099 tax form had ever been issued to the Boytors, as the issuance of such a form would have indicated that the $203,000 debt had been forgiven. *Id.* at 101:5-102:13. There was no evidence of a 1099 being issued, according to Hayden. *Id.* That testimony is credible because it is consistent with the documents in evidence, such as Hayden's email exchange regarding the 1099 form investigation and the bank records showing that a balance on the $203,000 loan existed past the April 3, 2009 maturity date. (DX31 at 174, 183-85). The bank also sent a letter to the Boytors in 2010 attempting to collect on the $203,000 note, which further buttresses Hayden's testimony about the Boytors' delinquency on the $203,000 note. *Id.* at 158.

Mr. Boytor's testimony on the $203,000 note and mortgage, by contrast, was not believable. As discussed above, Mr. Boytor is an experienced businessperson, so it is initially implausible that he would enter into three legal documents agreeing to pay the bank $203,000 without knowing where the $203,000 obligation came from. Mr. Boytor's other testimony on the $203,000 was not credible either. Mr. Boytor testified that the $203,000 amount was a strange number that did not add up: "if you add up everything that I paid in our agreement, it adds up to

34

more than what I owed. So this 203, I have no idea where it came from." (5/25/21 Trial Tr. 203:23-204:4). However, once the Boytors entered into the settlement agreement, as amended, along with the $203,000 note, they entered into new notes and mortgages to reduce the debt of Safe-T-Sense and Fox Controls to, at most, $734,309.35 ($300,000 + $31,309.35 + $200,000 + 203,000 = $734,309.35). *See supra* 23-25. Mr. Boytor later testified that he agreed to pay 1.15 million to settle the Fox Controls and Safe-T-Sense debt, which he claimed was comprised of: "$300,000 from Minarik . . . 600 [thousand] for a new mortgage, of which $50,000 was overpaid against the note, and $200,000 on the new note. So the 50 was against the []1.2 million, which . . . brought it down to a hundred thousand minus the 50 that they took on the new mortgage, and they wrote off the difference." (5/25/21 Trial Tr. 202:24-203:6). Mr. Boytor's testimony on the math of the deal is incomprehensible and contradicted by the documents he signed. His demeanor during this testimony, moreover, demonstrated uncertainty as to the calculation of the balance owed from the settlement agreement and the modification of the loans. In general, Mr. Boytor could not explain why he believed the $203,000 was a duplicate note, despite the plain terms of the amended settlement agreement showing two separate notes.

Thus, Mr. Boytor's testimony on the $203,000 note is not credible. The Boytors have also not introduced a shred of evidence that the $203,000 note was paid, such as cancelled checks, loan balance statements, or other documentary evidence that demonstrates they made even one payment on the $203,000 note.

Indeed, the only documents that purportedly support Mr. Boytor's version of events are the documents that Brennan created in error before she learned that the $200,000 note and $203,000 note were both required by the settlement agreement. (*See, e.g.*, DX14; DX15; DX23). Importantly, the internal Managed Assets Status Change and 1099 Form completed by Brennan,

(DX23), was an internal document that would not have been known to the Boytors; the Boytors' version of events appears to have been created after receiving discovery concerning the bank's internal documents.

In sum, the Court finds that PNC has shown the allegations in its complaint regarding Count I by a preponderance of the evidence. In particular, PNC has shown that it is more likely than not that the Boytors failed to pay $203,000 to the bank by the note's maturity date on April 3, 2009. The Boytors, by contrast, have failed to prove their affirmative defenses regarding the $203,000 note and mortgage by a preponderance of the evidence. The evidence shows that the $203,000 note was distinct and not duplicative of the $200,000 note. There was also adequate consideration for the $203,000 note, as the $203,000 note was executed as part of the settlement agreement. Even if the $203,000 note did require additional consideration, consideration was satisfied by the Boytors' receiving something of benefit from the $203,000 note and mortgage—namely the paying down of debt accumulated by Fox Controls and Safe-T-Sense, which was debt guaranteed by the Boytors. Finally, the Boytors' payment defense was at odds with the language of the settlement agreement documents and the other evidence in the record showing that the $203,000 note was not paid. The Court therefore finds in favor of PNC on Count I.

**D.      Count II – Breach of $200,000 Promissory Note**

In the second count of its complaint, PNC seeks a money judgment for the breach of the $200,000 promissory note.

**1.      PNC Has Proven Count II by a Preponderance of the Evidence**

Under Illinois law, a breach of contract plaintiff must show each of the following elements by a preponderance of the evidence: "(1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of contract by the defendant; and (4) resultant injury to

the plaintiff." *Hess v. Bresney,* 784 F.3d 1154, 1158-59 (7th Cir. 2015) (internal quotation marks and citation omitted). *See Felix v. Muchiri*, No. 15 C 2597, 2015 WL 7293575, at *4 (N.D. Ill. Nov. 19, 2015). The Court finds, for the reasons discussed below, that PNC has met its burden on Count II.

### A.     The $200,000 Note is a Valid and Enforceable Contract

On the first element, it is undisputed that the parties entered into a valid and enforceable promissory note on April 20, 2006 for $200,000. Under the terms of the promissory note, the Boytors promised to pay the bank $200,000 by the maturity date (originally April 3, 2009) in exchange for the bank's loan of $200,000. (PX4). At trial, Mr. Boytor admitted that he entered into the $200,000 promissory note and agreed to pay the $200,000. (5/25/21 Trial Tr. 199:14-200:5; 209:3-4). In her trial testimony, Mrs. Boytor confirmed that she signed and initialed the $200,000 note. (5/26/21 Trial Tr. 52:21-54:3). In short, there is no dispute as to the validity or enforceability of the $200,000 note, and the Court finds that the first element of PNC's breach of contract claim has been satisfied.

### B.     PNC Performed According to the Terms of the $200,000 Note

PNC has offered evidence sufficient to meet the second element of performance too. The promissory note required the bank to loan a principal amount of $200,000, which was not to be paid until the maturity date, with zero percent interest unless or until the Boytors defaulted. (PX4). The Disbursement Request and Authorization for the $200,000 note demonstrates that PNC held up its end of the bargain by advancing the $200,000 on April 20, 2006 toward settlement of the obligations of Fox Controls. (PX13; 5/25/21 Trial Tr. 61:1-62:10). The disbursement form further specified that the purpose of the loan was to "refinance the loan with EFS." (PX13). The Boytors, moreover, do not really dispute the bank's performance of the $200,000 promissory note. Thus,

the Court finds that PNC has shown that it is more likely than not true that PNC performed its obligations under the $200,000 promissory note.

## C. The Boytors Breached the Promissory Note

PNC has established the third element, breach by the Boytors, by a preponderance of the evidence. According to the terms of the promissory note, an "Event of Default" would occur if the borrowers "fail[ed] to make any payment when due under this Note." (PX4 at 1). The $200,000 note was originally due on April 3, 2009. *Id.* However, Brennan, on behalf of National City Bank, and the Boytors, executed a note modification agreement in 2009, which extended the maturity date by two years, bringing the due date to April 3, 2011. (PX8).

The Boytors insist that they paid the $200,000 note in 2008, when they obtained loans from American Chartered Bank. *See* Doc. [145] at 13-17. However, the evidence shows that the Boytors never paid the $200,000 note. As Brennan testified, the $200,000 note remained unpaid at the time of the note modification agreement in April 2009, nearly a year *after* the American Chartered deal. (5/26/21 Trial Tr. 82:8-16). The Court finds Brennan's testimony on this point credible, as it would not make sense for the bank or the Boytors to agree to extend the maturity date on a loan that had already been paid. Her testimony additionally conforms with the language of the note modification agreement, which provided that payments of principal and interest "continue[d] to be payable as provided for in the Note." (PX8 ¶ 2). Furthermore, by signing the note modification agreement, the Boytors agreed to ratify and confirm "all of the terms and conditions of the Note not specifically amended in this Modification[.]" (PX8 ¶ 3).

Brennan's testimony regarding the delinquency of the $200,000 note is additionally buttressed by the July 8, 2009 mortgage granted by the Boytors to secure the payment of the $200,000 note. (DX25). As Brennan explained, the bank sought collateral for the $200,000 note

in 2009 once it was discovered that the bank had mistakenly released the prior collateral securing the payment of the note. (5/26/21 Trial Tr. 109:23-110:25). Similar to the execution of the loan modification agreement, it would not make sense for the Boytors to grant a mortgage on their home to secure the payment of a note that had already been paid.

PNC established that the $200,000 note remained unpaid after the extended maturity date in 2011 as well. Hayden testified that the $200,000 note remained active on the bank's system in 2017 when he began working on the Boytors' file. (5/25/21 Trial Tr. 76:3-24, 98:2-99:14). According to Hayden, PNC's customary practice for when a note is paid is for the note to: be removed from the bank's loan system; shown as closed and paid; and, if requested by the borrower, marked as paid and returned to the borrower. *Id.* at 98:22-99:1. Hayden testified that, to his knowledge, none of those steps were taken with respect to the $200,000 note. *Id.* at 99:4-6. As of June 6, 2013, the customer balance was displaying as $200,000 in an internal bank record entered into evidence. (DX31 at 180). PNC also sent letters to collect the $200,000 note on at least three occasions after the 2011 maturity date: March 2014, September 2016, and October 2016. *Id.* at 194-207. PNC likewise has possession of the original note. Put simply, bank employees with knowledge of the Boytors' accounts testified credibly that the Boytors have not paid the $200,000 note, and that testimony is corroborated by the note modification agreement, the 2009 mortgage, internal bank records, and PNC's post-2011 collection efforts. And, similar to the $203,000 note, the Boytors have not offered a copy of a check, check stub, withdrawal record, or any other evidence documenting an actual payment made by the Boytors to the bank.

Mr. Boytor's testimony on the $200,000 note was additionally not credible. Mr. Boytor had a very faint memory of the events concerning the loans, and could not provide specific details about the transactions. He also could not credibly explain why he signed an extension of a

$200,000 note that he believed was paid off, nor could he provide an explanation why he would mortgage his home to secure a note that had been repaid. Mr. Boytor's lack of testimony on these key facts was telling. In hearing his testimony, it was clear to the Court that at some point, Mr. Boytor became genuinely confused about his outstanding obligations, and now at trial with a looming balance, was looking for a way out of repayment after the passage of so many years. His confusion is understandable—there were multiple loan transactions and modifications over the course of many years. The original bank Mr. Boytor dealt with was absorbed over and over again by new financial institutions. Mr. Boytor was also engaged in other transactions with financial institutions and lenders as part of his business operations, and had debt obligations elsewhere. Mr. Boytor clearly did not keep track of his own loan obligations. And the banks here, because the loans transferred hands so many times, did not seek collection on a timely basis, and ultimately waited three years from the last default date to seek recovery. However, the Boytors have not directed the Court to any evidence that shows they paid the $200,000 note, nor any law that excuses their failure to pay the $200,000 note. Consequently, in consideration of the testimony and documents surrounding the $200,000 note, the Court finds that PNC has proven the breach element by a preponderance of the evidence.

### D. Damages

PNC has proved its damages, the fourth element of their breach of contract claim, as well. The promissory note empowered PNC, upon the Boytors' default, to "declare the entire unpaid principal balance on [the] Note and all accrued unpaid interest immediately due[.]" (PX4 at 1). While the loan accrued no interest prior to maturity, the bank had the right, upon the Boytors' default, to increase the interest rate on the note up to 7.5%, as permitted by applicable law. *Id.* The promissory note further granted the bank rights to attorneys' fees and expenses, to be paid by the

40

Boytors upon their default. *Id.* Hayden calculated that, as of May 3, 2021, the Boytors owed $354,375 on the $200,000 note ($200,000 principal + $154,375 interest with $41.666667 per diem). (PX10). At trial, Hayden testified that PNC's records mirror his damages calculation. (5/25/21 Trial Tr. 92:15-93:2). The Court finds that Hayden's calculations and testimony provide sufficient evidence to satisfy the damages element of their claim.

To summarize, the Court finds that PNC has proved each element of its breach of contract claim by a preponderance of the evidence: (1) the $200,000 note was a valid and enforceable agreement; (2) PNC performed according to the terms of the promissory note; (3) the Boytors breached the promissory note by failing to pay the principal by maturity; and (4) PNC's injury from the Boytors' breach is at least $353,375 under the terms of the agreement. Having found that PNC has satisfied its burden on Count II, the Court turns to assessing the Boytors' affirmative defenses on Count II.

### 2. The Boytors Have Failed to Prove Their Affirmative Defenses on Count II

The Boytors raise four affirmative defenses in connection with the $200,000 note: (1) payment; (2) release; (3) waiver; and (4) estoppel. The Court finds, for the reasons described below, that the Boytors have failed to establish any of their Count II defenses by a preponderance of the evidence.

### A. Payment

The Boytors insist that they paid the $200,000 note with loan money they received in 2008 from their transaction with American Chartered. According to the Boytors, in or around 2008, Mr. Boytor asked the bank for payoff letters for all of the amounts the Boytors owed to the bank as part of the Fox Controls and Safe-T-Sense settlement agreement. Doc. [145] at 13. Then, Brennan sent only two payoff letters, one for $200,000 and one for $600,000. (DX14 & DX15). The

Boytors subsequently closed their loans with American Chartered in the amount of $1.5 million on July 31, 2008, and they maintain that "some of the proceeds of the loan were paid to plaintiff in full satisfaction of all monies owed pursuant to the settlement agreement." Doc. [145] at 13 (citing DX17 & DX18). The Boytors allege that the $200,000 note was paid with the American Chartered money, as evidenced by the bank's August 6, 2008 release of the $200,000 mortgage. *Id*. at 14 (citing DX19).

There is no evidence, other than Mr. Boytor's not credible testimony, see *supra*, at 38, connecting the American Chartered loans to the $200,000 note. The American Chartered loans themselves say nothing about the Boytors' outstanding debts with PNC's predecessors. (DX17; DX18; 5/26/21 Trial Tr. 44:15-46:12). In addition, while the bank records indicate that the $600,000 note was paid near the time of the American Chartered transaction, Hayden testified credibly that no such evidence existed with respect to the $200,000 note. (5/25/21 Trial Tr. 98:22-99:14, 128:1-20). Brennan further testified that as of the time of the note modification agreement in 2009, she was 100% positive that the $200,000 note had been paid because the bank would not extend the terms of payment on a note that had been paid off. (5/26/21 Trial Tr. 82:8-18). The language of the note modification agreement, too, indicated that the $200,000 note was still owing as of April 2009 because the modification ratified the terms of the original promissory note and stated that the principal and interest remained payable. (PX8).[12]

---

[12] The Boytors argue that the note modification agreement is unenforceable as lacking consideration. Doc. [145] at 16-17. The Boytors allege that because the $200,000 note was already paid in 2008, the Boytors "did not receive anything from the plaintiff in 2009." *Id.* The Boytors' circular argument is off base. As discussed above, there is no evidence of an actual payment being made on the $200,000 note. There was consideration for the note modification agreement, moreover, because the Boytors did get something of value from the agreement. *See Bires*, 662 F. Supp. 2d 1019 at 1028. Specifically, the Boytors received an additional two years to pay the principal amount of the $200,000 loan with zero percent interest accruing until default.

The Boytors' primary argument that they paid the loan is based on the release of the $200,000 mortgage. *See* Doc. [145] at 14-15. On August 6, 2008, National City Bank executed a release of the $200,000 mortgage, which had been recorded as Mortgage No. 2006K048628. (DX19). The release provided that National City, "in consideration of the payment of the indebtedness secured by the Mortgage Deed hereinafter mentioned, and the cancellation of the note thereby secured, and of the sum of One Dollar, the receipt whereof is hereby acknowledged, does hereby REMISE, CONVEY, RELEASE, and QUIT CLAIM unto Samuel G Boytor and Carol A Boytor . . . all the right, title, interest, claim or demand whatsoever it may have acquired in, through or by [the mortgage.]" *Id.* The Boytors argue that, because the release stated in its consideration recital that the release was being made in light of the payment of the indebtedness, that the $200,000 note had been paid. Yet, the consideration recital is not controlling here. As the Boytors concede, Doc. [145] at 13, a consideration recital can be rebutted with contradictory evidence introduced by the plaintiff.[13] *See Polo Nat. Bank v. Lester*, 183 Ill. App. 3d 411, 415, 539 N.E.2d 783, 786 (1989) ("Extrinsic evidence is permissible to show that the recital of consideration in a deed or other like document contract is not the actual consideration."); *Paccagnini v. Bort*, 41 Ill. App. 2d 216, 190 N.E.2d 493 (Ill. App. Ct. 1963) (holding consideration recitals are not conclusive and that courts may inquire into consideration and look to parol evidence as to what

---

[13] In their response brief, the Boytors attempt to retract their earlier position, arguing that the release establishes "estoppel by deed," which the Boytors claim "precludes a party to a deed . . . from denying the[] truth of any material fact asserted in it." Doc. [147] at 10-11. The Boytors, however, cite to no case applying the estoppel by deed doctrine to a mortgage release, so the Court is initially dubious that the doctrine applies. The Boytors further misread 765 ILCS 905/4. *Id.* at 11. That law does not state that "when a court is presented with documents such as release deeds created by PNC that state all obligations have been paid it 'raise[s] a presumption that the obligation has been paid.'" *Id.* Rather, the law states that in an action to obtain a release after the payment of the debt secured by the mortgage has been paid, "introduction of a *loan payment book* or *receipt* which indicates the obligation has been paid shall be sufficient evidence to raise a presumption that the obligation has been paid." 765 ILCS 905/4 (emphasis added). As stated throughout this opinion, the Boytors have failed to introduce a loan payment book, receipt, or other record of payment of the $200,000 or $203,000 note. The Boytors' estoppel by deed argument accordingly fails.

true consideration was so long as parol evidence does not destroy legal effect); *Illinois Casket Co. v. Cohn*, 323 Ill. App. 279, 55 N.E.2d 113 (Ill. App. Ct. 1944) (holding true consideration may be shown by parol or extrinsic evidence).

In *Polo National Bank*, the plaintiff bank sued defendants for their failure to pay a $23,000 promissory note. *Polo*, 183 Ill. App. 3d at 412. To secure payment of the note, the defendants had granted a second mortgage on their residence in the form of a trust deed. *Id.* at 413. Later, the residence was sold, and the bank received $19,105.25 to apply toward the $23,000 note. *Id.* Prior to closing on the house, the bank executed a release of the trust deed, which contained the following consideration recital:

> The party secured in and by a certain trust deed executed by . . . do hereby acknowledge receipt of full payment and satisfaction of the moneys secured in and by said document, and in consideration thereof do hereby FOREVER release and discharge the same, and quit claim all right and interest to and in the premises therein described or conveyed, for a description whereof reference may be had to said document or said record thereof. Said trust deed was made to secure one or more promissory notes bearing even date therewith aggregating the sum of Twenty-three thousand and 00/100—Dollars. I further certify that said note or notes has or have been presented to me with satisfactory evidence that the same, with interest due thereon, has or have been fully paid and cancelled."

*Id.* After the bank received the $19,105.25 from the house sale, it notified the defendants that they still owed $5,286.94 on the note. *Id.* When the defendants failed to pay the remaining amount owed on the note, the bank filed suit against the defendants. *Id.* At trial, a bank employee testified that although the bank released the trust deed, it never intended to release the underlying note. *Id.* at 413-14. The bank also offered extrinsic evidence showing that the remainder of the note had not been paid, including the bank's possession of the note, which had not been cancelled. *Id.* at 414. The trial court found that the parol evidence applied to the release but also found that the court could consider parol evidence to discern the true intent of the parties. *Id.* The trial court

44

found that the extrinsic evidence did not support the bank's position regarding the bank's intention to keep the remainder of the note. The appellate court reversed, finding that the trial court was incorrect in finding that discerning the true intent of the parties could override the parol evidence rule. *Id.* at 415. Yet, the reviewing court found that extrinsic evidence could be used "to show that the recital of consideration in a deed or other document contract is not the actual consideration," so long as the extrinsic evidence showing does not defeat the legal operation and effect of the document *Id.* (citations omitted). For the case at hand, the court found that the extrinsic evidence showed that the bank did not receive full payment for the note, despite the language in the release. *Id.* The *Polo National Bank* Court further looked to the fact that the bank still possessed the note, which was signed by the defendants and which had not been marked cancelled. *Id.* The Court consequently determined that the actual consideration was the $19,105.25 that had been received by the bank, "not the full payment and cancellation of the note as recited in the release." *Id.*

Here, as in *Polo National Bank*, it is permissible for the Court to consider extrinsic evidence regarding the release to determine if the consideration recited was the actual consideration for the release because PNC is not contesting the validity of the release. As Hayden testified, a bank may release collateral without receiving payment for the underlying note for different reasons, such as allowing a new lender to get a senior lien position on the real estate. (5/25/21 Trial Tr. 98:10-21). While the nature of the consideration received for the $200,000 mortgage release is unclear in this case, it is clear that the actual consideration was different from what was listed in the recital. That is, there is no evidence that the Boytors actually paid the underlying $200,000 note or even the "one dollar" stated in the consideration clause.[14] There is furthermore no evidence indicating that

---

[14] Although the Court shares the Boytors' frustration regarding the bank document at DX31 at 175, in which the Boytors' payment amounts from August 2008 are obscured by the document being cut off on the right side, the Court finds no evidence that the bank "intentionally altered the document so that the Court could not see the amounts paid." Doc. [145] at 14. Instead, it seems that the printout is an old National City

the $200,000 note was cancelled. Like the bank in the *Polo National Bank* case, PNC still possesses the signed $200,000 note, which is not marked cancelled. As a result, the Court finds that the consideration recital is contradicted by the evidence in the record and is not controlling.[15]

The Boytors' release-recital argument is further undermined by the legal documents the Boytors signed after the 2008 release document. If the underlying $200,000 note was paid and cancelled by the time of the release in August 2008, it is unlikely that the Boytors would have entered into an agreement modifying the maturity date of the $200,000 note. (PX8). The Boytors emphasize that the release of the $200,000 mortgage was a publicly recorded document, and that "if society cannot rely upon the veracity of recorded documents, chaos will surely erupt." Doc. [145] at 14. Yet, nearly a year after the Boytors claim they had paid off the $200,000 note, the Boytors granted a mortgage on their home to the bank as security for payment of the $200,000 note. (DX25). That document, just like the release, was a publicly recorded document, with the Kane County reporting number of 2009K058108. *Id.* If indeed society must be able to rely on the veracity of public documents according to the Boytors, then the Court will accept that conclusion and rely on the fact that the Boytors' mortgaged their home to secure the $200,000 note in 2019— something they would not have done if they had already paid it off. Given these post-release documents, it is clear that the $200,000 note remained due and owing after the release of the

---

document that did not print well off of the old banking system. It is reasonable that PNC would not be able to get a better version of the document at this point, some sixteen years after the merger with National City. Thus, this document is not helpful and does not weigh into whether payment was made on the $200,000 note as the operative details are missing. In any event, the Court finds Hayden's testimony credible that the three payments from 2008 listed in the exhibit could represent one payment for principal, one payment for interest, and one payment for fees on the $600,000 loan. (5/25/21 Trial Tr. 128:1-131:16).

[15] The consideration recital in the release, which is equivocal and contradicted by the evidence, is not an admission by the bank. *See* Doc. [145] at 15. Even if the consideration recital did constitute an admission, the Court declines to give much, if any, weight to the admission in light of the contradictory evidence in the record. *See Eychaner v. Gross*, 202 Ill.2d 228, 251, 269 Ill. Dec. 80, 779 N.E.2d 1115 (2002) ("In a bench trial, the trial court must weigh the evidence and make findings of fact.").

collateral. The Court therefore finds that the Boytors have failed to show that it is more likely than not that they paid the $200,000 note.

### B.     Release

The Boytors' next defense similarly involves the August 2008 release of the $200,000 mortgage on the commercial Rippburger property. The release provided, in important part, that National City Bank:

> does hereby REMISE, CONVEY, RELEASE, and QUIT CLAIM unto Samuel G Boytor and Carol A Boytor . . . all the right, title, interest, claim or demand whatsoever it may have acquired in, through or by a certain Mortgage Deed bearing date of the 20th day of April A.D. 2006 and recorded May 8, 2006 . . . as document No. 2006K048628.

(DX19). The Boytors read this release language to mean that PNC released its rights to not just the mortgage, but the underlying note as well. Doc. [145] at 17.

Under Illinois law, "The release of a mortgage amounts only to the release of an interest in or lien on the mortgaged property. In and of itself, such a release does not necessarily mean that other rights the parties may have under the mortgage agreement are extinguished. *Daiwa Bank, Ltd. v. La Salle Nat. Tr., N.A.*, 229 Ill. App. 3d 366, 385, 593 N.E.2d 105, 116 (2d Dist. 1992) (citation omitted).[16] A release is a contract and its construction is governed by the rules of law for contracts. *Polo*, 183 Ill. App. 3d at 414 (citations omitted). As such, a release "should be given a fair and reasonable interpretation based on consideration of all its language and provisions." *Weidner v. Szostek*, 245 Ill. App. 3d 487, 491, 614 N.E.2d 879, 881 (1993) (citation omitted).

---

[16] In support of their arguments, the Boytors cite a litany of release cases, none of which involves a mortgage release. See Doc. [145] at 18. *See, e.g., Carlile v. Snap-on Tools*, 648 N.E.2d 317, 271 Ill. App. 3d 833 (1995) (release in termination agreement between manufacturer and former dealer); *Weisblatt v. Colley*, 637 N.E.2d 1198, 265 Ill. App. 3d 622(1994) (mutual release agreement between lawyer and former client).

Here, while the Boytors' reading of the documents is creative, the Court finds that the "fair and reasonable interpretation based on consideration of all [the] language and provisions," of the mortgage release, *Weidner*, 185 Ill. Dec. 438, 614 N.E.2d at 881, is that the release pertains to any right, title, interest, claim, and demand the bank acquired through Mortgage No. 2006K048628 specifically, such as "the Grantor's right, title, and interest in and to the [] described real property . . . located [at] 11N026 Rippburger Road, Plato Center, IL," (DX5 at 1-2), not the rights and claims that had already been provided for in the distinct promissory note. The very purpose of the junior Rippburger mortgage was to secure the rights that the bank had already obtained through the $200,000 promissory note. (DX5 at 1, 12). The release of the rights acquired through the $200,000 Rippburger mortgage, therefore, means that the bank simply released its security, or collateral, for the underlying promissory note, not the rights previously granted in the promissory note itself. And contrary to the Boytors' position, *see* Doc. [145] at 17, the $200,000 note's incorporation of the mortgage terms does not mean that the mortgage release operated to release the underlying note as well. The mortgage release says nothing about the promissory note, and the note's incorporation of the mortgage's terms does not mean that the mortgage incorporated all of the rights and terms of the note. The Boytors point to no language in the release or other evidence in the record that convinces the Court the mortgage release should be read more expansively. The Court therefore finds that the Boytors have failed to show that it is more likely than not true that the bank waived its rights under the promissory note when it released the $200,000 Rippburger mortgage.

C.    Waiver

The Boytors' next affirmative defense is that PNC waived its right to enforce the $200,000 note by virtue of the mortgage release.[17]   Waiver in a contractual setting under Illinois law "is defined as the intentional relinquishment of a known right[.]" *Abellan v. Lavelo Prop. Mgmt., LLC*, 948 F.3d 820, 829-30 (7th Cir. 2020) (internal quotation marks omitted) (quoting *In re Krueger*, 192 F.3d 733, 738-39 (7th Cir. 1999)).   Waiver excuses but does not erase "an admitted breach by the legal . . . effect of defeating a remedy for it." *Id.* (citation omitted).   To prove a claim of waiver under Illinois law, a party must show that the non-breaching party: "(1) knew of its right to assert the breaches, and (2) intended to waive the alleged breaches." *Levin v. Grecian*, 974 F. Supp. 2d 1114, 1124-25 (N.D. Ill. 2013) (citations omitted).

The Boytors have failed to make a showing of waiver here.   In particular, their waiver argument is in tension with their claim that they paid the $200,000 note.   To succeed on their waiver defense, the Boytors would have to show that PNC knew of its right to assert a breach of the $200,000 note, but if the Boytors paid the note with the American Chartered transaction as they claim, PNC could not have known "of its right to assert the breaches[.]" *Levin*, 974 F. Supp. 2d at 1124-25.   There is also no evidence in the record demonstrating that the bank intended to waive the Boytors' breach of the promissory note.   The evidence in the record, including the 2009 note modification agreement, the 2009 mortgage securing the $200,000 note, and the bank's collection correspondence, show that the bank intended to collect its $200,000. (PX8; DX25; DX31 at 194-207).   The Boytors have accordingly failed to prove their waiver defense.

---

[17] The Boytors did not actually plead this affirmative defense in their amended answer.  Thus, for this reason alone, this argument cannot win the day for the Boytors. *Pinto Trucking Serv., Inc. v. Motor Dispatch, Inc.*, 649 F.2d 530, 534 (7th Cir. 1981) ("Any defense not pleaded is waived.").  However, because the Boytors' waiver argument is largely repetitive of its release argument, the Court addresses it here.

### D. Estoppel

The Boytors next aver that PNC is equitably estopped from collecting the $200,000 note. To make out a defense of equitable estoppel, the party claiming estoppel must establish the following elements: "(1) the other party misrepresented or concealed material facts; (2) the other party knew at the time the representations were made that the representations were untrue; (3) the party claiming estoppel did not know that the representations were untrue when the representations were made and when they were acted upon; (4) the other party intended or reasonably expected the representations to be acted upon by the party claiming estoppel or by the public generally; (5) the party claiming estoppel reasonably relied upon the representations in good faith and to their detriment; and (6) the party claiming estoppel has been prejudiced by his reliance on the representations." *Parks v. Kownacki*, 193 Ill.2d 164, 249 Ill. Dec. 897, 737 N.E.2d 287, 296 (2000) (citation omitted). The policy behind equitable estoppel is that "one cannot justly or equitably lull his adversary into a false sense of security, causing him to subject his claim to the bar of the statute, and then plead the very delay caused by his course of conduct." *Beynon Bldg. Corp. v. Nat'l Guardian Life Ins. Co*., 118 Ill.App.3d 754, 74 Ill. Dec. 216, 455 N.E.2d 246, 252 (Ill. App. Ct. 2nd Dist.1983).

The Boytors' estoppel defense fails because the Boytors have failed to make the requisite showing. The Boytors' equitable estoppel argument boils down to the following purported sequence of events: the Boytors requested the payoff amounts for all monies owed; the bank provided the payoff letters; the Boytors obtained the American Chartered loans and paid off all outstanding debt from the Fox Controls settlement agreement; the plaintiff recorded releases; and then the bank "waited almost 12 years form the time the Note was executed to file a lawsuit." Doc. [145] at 21. The Boytors' equitable estoppel defense fails for at least two reasons.

As discussed above, the Boytors' account of events is, *first*, contradicted by the evidence. There is no evidence, other than Mr. Boytor's testimony, that the bank intended the payoff letters to comprise all of the Boytors' debt with the bank. There is no evidence that the American Chartered Loan proceeds went to paying off the $200,000 note. The bank, furthermore, did not wait 12 years to try to pursue its rights under the promissory note. In 2009, the bank extended the maturity date to 2011. (PX8). Also in 2009, the bank obtained a mortgage from the Boytors on their home in order to secure the payment of the note. (PX25). The bank then sent correspondence to the Boytors as early as 2014 (only 3 years after the maturity date) informing them that they were in default on the $200,000 note. (DX31 at 194-207).

*Second*, even if the Boytors were correct in their sequence of events, they have not shown that PNC misrepresented or concealed material facts, nor that they actually relied upon such a misrepresentation to their detriment. If the bank intentionally misled the Boytors to believe that the $200,000 note was no longer owing by releasing the $200,000 Rippburger mortgage, and the Boytors "fell" for that misrepresentation, they would not have: (a) agreed to extend the maturity date of the $200,000 note; nor (b) granted the bank another mortgage on their home in order to secure the payment of the $200,000 note. Those subsequent actions by the Boytors show that they understood that they still owed the $200,000 note and acted to their benefit, not detriment, by getting more time to pay the loan and by offering up their home as collateral for the note to provide the bank with security on the loan. The Boytors' equitable estoppel defense, like the Boytors' other affirmative defenses on the $200,000 note, consequently falls short.[18]

---

[18] Towards the end of their brief, the Boytors throw in the following hasty and undeveloped argument: "[T]he plaintiff cannot pursue claims against the Boytors based upon the release, based upon waiver and based upon estoppel. The same arguments to Count II apply with equal force to Count I." Again, perfunctory and undeveloped arguments are waived, so the Court will not consider those defenses with respect to Count I, as the Boytors did not explain how those defenses apply to the $203,000 note. *See Cisneros*, 846 F.3d at 978.

### E.   Accord and Satisfaction

The Boytors finally argue that the doctrine of accord and satisfaction generally extinguished the Boytors' obligation to pay both the $200,000 note and the $203,000 note. Doc. [145] at 29. An accord and satisfaction "is a contractual method of discharging a debt or claim and requires: '(1) a bona fide dispute, (2) an unliquidated sum, (3) consideration, (4) a shared and mutual intent to compromise the claim, and (5) an execution of the agreement.'" *Bd. of Libr. Trustees of Vill. of Midlothian v. Bd. of Libr. Trustees of Posen Pub. Libr. Dist.*, 2015 IL App (1st) 130672, ¶ 44, 34 N.E.3d 602, 615 (quoting *Saichek v. Lupa*, 204 Ill.2d 127, 135, 272 Ill. Dec. 641, 787 N.E.2d 827 (2003)). The debtor carries the burden of demonstrating that the creditor "intended to accept the payment in settlement of the dispute," and "in the absence of such a showing, the payment only operates as a discharge to the extent of the amount paid." *Id.* at 615 (citation omitted).

The Boytors' accord and satisfaction defense falls flat because the Boytors have not shown that the bank agreed to the Boytors paying a lesser amount than the sums owed on the notes. As discussed above, the releases signed by the bank only released the collateral specified in each release. As such, the $200,000 mortgage release did not release the Boytors' obligations under the $200,000 note, and the $203,000 mortgage and note remain intact. Quite simply, there is no evidence that the parties came to a new arrangement wherein the Boytors would pay less for their outstanding debt. Even if the record did include such an agreement, the Boytors would still have to show they executed the agreement by paying the agreed-to sum. While the evidence shows that the Boytors paid the $600,000 note, there is no evidence that when that payment was made there was an "explicit understanding of both parties that it [was] in full payment of all demands." *Integrated Genomics, Inc. v. Kyrpides*, No. 06 C 6706, 2010 WL 375672, at *15 (N.D. Ill. Jan. 26,

2010) (citing *A.F.P. Enters., Inc. v. Crescent Pork, Inc.*, 611 N.E.2d 619, 623, 243 Ill. App. 3d 905, 183 Ill. Dec. 356 (Ill. App. Ct. 1993). In fact, the record demonstrates the opposite understanding. After the $600,000 note was paid off in 2008, the parties: extended the maturity date of the $200,000 note, executed a mortgage to secure the $200,000 note, and maintained the bank's mortgage on the $203,000 note. (PX8; DX25; PX6). The bank further demonstrated its understanding that the Boytors still owed money on the $200,000 and $203,000 notes by sending collection correspondence to the Boytors. (DX31 at 155, 158, 194-207). Because the Boytors have not shown that the parties had a mutual agreement for the Boytors to pay less than what they owed under the settlement agreement and related documents, their accord and satisfaction defense fails.

In conclusion, the Court finds in favor of PNC on both counts. PNC has met its burden of proof to foreclose on the $203,000 mortgage (Count I), and it has met its burden of proof for an entry of a money judgment relating to the nonpayment of the $200,000 note (Count II). The Boytors, on the other hand, have failed to prove any of their affirmative defenses by a preponderance of the evidence. Because the Court finds in favor of PNC on both counts, the Court need not address the Boytors' request that PNC remove all liens, *see* Doc. [145] at 30, nor the Boytors' request for attorneys' fees. *Id.* at 31-32.

### IV. CONCLUSION

For the reasons stated above, Defendants' Motion for Leave to File Amended Answer and Affirmative Defenses, Instanter [129] is granted, and the Court finds in favor of Plaintiff and against Defendants on both counts of the complaint after conducting a bench trial. As a result, the Court will enter a judgment of foreclosure and sale on the $203,000 mortgage on Count I and a money judgment in the amount of $354,375 on Count II. By September 30, 2021, Plaintiff shall file a proposed judgment of foreclosure and sale on the $203,000 mortgage (No. 2006K047339)

on Count I.  The Court will enter the money judgment on Count II following receipt of Plaintiff's proposed judgment of foreclosure and sale.  Plaintiff shall present its request for attorneys' fees pursuant to Local Rule 54.3.  In accordance with Local Rule 54.3(d), the parties are ordered to confer and attempt in good faith to agree on the amount of attorneys' fees that should be awarded prior to Plaintiff filing a fee motion.


**SO ORDERED.**


Dated:  September 10, 2021

_____

Sunil R. Harjani
United States Magistrate Judge